Below is an Opinion of the Court.

*Elizabeth L Perris*
—————————————
ELIZABETH PERRIS
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: | ) |
| | ) Bankruptcy Case No. |
| PRAKOPIY CAM, | ) 13-34588-elp7 |
| | ) |
| Debtor. | ) |
| | ) |
| UNITED STATES TRUSTEE, | ) Adversary No. 13-3318-elp |
| | ) |
| Plaintiff, | ) MEMORANDUM OPINION |
| | ) |
| v. | ) |
| | ) |
| PRAKOPIY CAM, | ) |
| | ) |
| Defendant. | ) |

The United States Trustee ("UST") filed this complaint to deny debtor a discharge under four sections of § 727(a): failure to keep adequate records; failure to explain satisfactorily the loss or deficiency of assets; false oaths; and concealment, transfer, or removal of assets. Defendant debtor Prakopiy Cam answered, denying the allegations of the complaint and blaming some of his lack of disclosure on his bankruptcy case counsel. At a June 9, 2014, hearing on a motion

for protective order filed by debtor's bankruptcy attorney, debtor waived
his attorney-client defenses.

This case was tried on September 23, 2014, and was continued to and
concluded on September 24, 2014.  The UST appeared through counsel;
debtor appeared pro se.  Based on my findings of fact and conclusions of
law set out below, I conclude that debtor's bankruptcy discharge will be
denied.

FACTS

Debtor was a berry farmer in the Willamette Valley.  He leased three
parcels of farm land from his uncle, Pirfil Cam ("Mr. Cam"), and a fourth
parcel from a different owner, which were operated as a single large farm
("the Berry Farm").[1]

In March 2012, debtor also leased a separate 80-acre parcel from a
third lessor, which he calls "Berry Empire."  Exh. 19.

After leasing the Berry Empire property, on May 3, 2012, debtor gave
his sister, Anna Snegirev ("Snegirev"), a handwritten note that said
debtor could manage both the Berry Empire farm and the Berry Farm for the
2012 season and that, "if nothing happens this season," the Berry Farm
would be hers for 2013.  Exh. 10, p. 106.  Debtor and Snegirev[2] both
testified that debtor wanted to give Snegirev the Berry Farm to help her

---

[1]    As used in this Opinion, "the Berry Farm" includes all of
debtor's interest in the leased property as well as whatever interest he
had in assets arising from the business conducted on that property,
including berries, accounts receivables, and the proceeds therefrom.

[2]    Snegirev's testimony was provided via a transcript of her
October 30, 2013, Rule 2004 Examination, Exh. 10.  She did not provide
any live testimony at the trial.

Page 2 -  MEMORANDUM OPINION

with medical bills resulting from her cancer treatment.  Snegirev lived in Lincoln City and had a job there; she had not been involved in operating the farm before 2012 and began learning the business during the 2013 season.  She understood that the farm was leased from their uncle, and that there was a lot of debt related to the farming operation.

Debtor managed the Berry Farm during 2012 and 2013.  In early 2013, debtor and Snegirev agreed that debtor would be paid a salary of $2,400 per month for his work on the Berry Farm.  Snegirev testified that she viewed 2013 as a transition period during which the Berry Farm would be transferred to her.

Debtor continued to operate the Berry Farm as he had before, including dealing with berry processors and other third parties, in his own name.  Snegirev did not open bank accounts in her name for the Berry Farm or register with the Oregon Secretary of State.  Snegirev's name did not appear on any of the business records, neither she nor debtor informed their uncle that she was the owner of the Berry Farm and debtor did not inform any other third parties that Snegirev was the owner of or involved with the Berry Farm.  Checks for proceeds of berry sales from the Berry Farm were issued in debtor's name and either cashed by him or deposited into his personal bank accounts.  Snegirev did not receive any payments from Berry Farm proceeds before the petition date.

Debtor failed to pay at least a portion of the rent owed to Mr. Cam, and by June 2013, he was in arrears approximately $45,000.  Exh. 16.  On June 18, 2013, debtor agreed to give Mr. Cam a security interest in berry receipts from the Berry Farm.  Under that agreement, debtor was required to give Mr. Cam half of any berry crop proceeds until the rent arrears

were paid in full, and all checks and proceeds from the sale of berries
were to be paid jointly to debtor and Mr. Cam.  Id.

In August 2013, debtor received a check for $29,000 from a berry
processor, issued jointly to debtor and Mr. Cam.  When debtor and Mr. Cam
could not come to agreement about who was entitled to the proceeds
(debtor denied that any of the proceeds belonged to Mr. Cam), debtor
cashed the check without Mr. Cam's signature by having his girlfriend
provide the second signature.

Between the time of the security agreement with Mr. Cam and debtor's
bankruptcy, debtor made two payments to Mr. Cam for the leases, for
$9,897.86 and $3,307.18.  Exh. 20.

Despite the fact that debtor was planning to transfer the Berry Farm
to Snegirev, in March 2013, debtor entered into a sublease with Efim
Chernishoff of one of the parcels of the Berry Farm that was leased from
Mr. Cam.  Exh. 21.  This is one of the parcels that was subject to the
crop proceeds security interest debtor granted to Mr. Cam a month later.
Debtor did not ask Mr. Cam for permission to sublease the property, nor
tell him about it.  Snegirev's name does not appear in any capacity on
the sublease.

In June 2013, debtor signed a Credit and Security Agreement with
Columbia Fruit, LLC, a berry processor, to get a $20,000 crop advance,
giving a security interest in his "2013 Blackberry Crop."  Exh. 25.  The
Credit and Security Agreement included debtor's representation that he
was the sole owner of the collateral.  Snegirev's name was not on the
Credit and Security Agreement, nor did she sign it.  He testified that

Page 4 -  MEMORANDUM OPINION

1 the loan was not for the Berry Empire crop[3] and that he represented that
2 he owned the collateral in order to get the loan.  I conclude that the
3 berry crop referred to in the security agreement included the blackberry
4 crop from the Berry Farm.

5       Checks from berry processors in 2013 continued to be issued solely
6 to debtor or to debtor and Mr. Cam jointly.  None of the 2013 checks for
7 berries from the Berry Farm included Snegirev's name.

8       Debtor did not maintain any bookkeeping or other business records
9 system.  The UST's analyst reviewed all of debtor's bank records and
10 other documents provided in an attempt to determine debtor's financial
11 transactions in 2013 and 2014.  She found that, between January 15, 2013,
12 and the petition date of July 18, 2013, debtor deposited berry processor
13 checks into his bank accounts in the amount of $76,926,[4] and cashed
14 checks from processors in the amount of $40,705.  Exh. 54.  He received
15 $20,000 from Chernishoff for the sublease in March 2013.  Exh. 55.  Thus,
16 the records show that he had received funds from his business during that
17 period totaling $137,631.

18       The bank records also show that debtor had total deposits into his
19 bank accounts during that same time of $153,683.  Exh. 56 at p.8.  The
20 difference between business receipts and total deposits results from a
21 number of deposits of cash that came from unknown sources as well as some

22 _____

23       [3]    Although debtor had by this time leased the Berry Empire
   property, he testified that the berry crop on that property was immature
24 and it was not clear whether there would be a crop from Berry Empire that
   could be harvested in 2013.
25

26       [4]    This does not include a check for $5,001.34 that was dated July
   8, 2013, but deposited post-petition on July 19, 2013.

other payments from sales of property.

Debtor's records show business expenses of $84,653.13, made up of $34,620.33 expenses paid through his bank accounts and $50,032.80 cash wages paid to workers, between January 1 and July 18, 2013.  Exh. 60; Exh. 57 at p.6.  The records also show that debtor paid personal expenses of $6,730 from his bank accounts.

In the prepetition period of 2013, the records show that debtor had $147,113 in cash, made up of cash withdrawals from his bank accounts, cashed payments from berry processors, and other unidentified cash.  Exh. 65.  Subtracting the $50,032 cash that was used to pay payroll for the prepetition period of 2013 leaves $97,081.  There are no records showing what happened to the $97,081 in cash.  Debtor listed $72 cash on hand in his Schedule B.  Exh. 3.

In the post-petition period from July 19, 2013, to September 25, 2013, debtor cashed and deposited checks from berry processors in an amount of $106,191.18.  Exh. 54.[5]  His records show business expenses of $12,187.18 during the same period.  Exh. 58.[6]  This leaves $94,004.00 in net income during that post-petition period, some of which is shown to have been used for debtor's personal expenses.  Debtor could not account for the remainder of the receipts.  Debtor listed $0 accounts receivable on his bankruptcy schedules, saying that the accounts receivable belonged

---

[5]   This includes the prepetition check of $5,001.34 that was deposited post-petition.

[6]   Exhibit 58 includes expenses through April 30, 2014.  I calculated the expenses for the same period as the period used for calculating income, July 19 through September 25, 2013.

Page 6 -   MEMORANDUM OPINION

to his sister Snegirev.  Under "crops," he listed berries with a value of $0.

The records show postpetition payments to Snegirev totaling $1,250. Exh. 58 at p.2.  In addition, Snegirev took two cash draws in 2013 totaling $200.  Exh. 10 at pp. 41-42; 164.  Debtor represented to Snegirev that the remainder of the berry income from the Berry Farm had been used for paying workers and other farming expenses.  Exh. 10 at p.27, 29, 31.  Snegirev knew that debtor had a bank account at Wells Fargo where he deposited berry checks; she did not know that he also had a Columbia Bank account.  In 2013 before he filed bankruptcy, debtor deposited more than $100,000 into the Columbia account, including berry proceeds and sublease income,.  Exh. 10 at p.31-32; Exh. 56.

After debtor filed his petition, the Chapter 7 trustee received a total of $80,049 in proceeds from debtor's crops.

In debtor's bankruptcy schedules, he disclosed that he owned a 1993 Infinity J-30, a 1995 Dodge Ram, a jet ski, a Littau berry harvester, a mower/tiller, and some hand tools.  Exh. 3 at p.10.  In his Statement of Financial Affairs ("SOFA"), he disclosed that he was holding a Ford F450 for his father, Visily Cam, and that he had sold a 2006 Toyota Tacoma to his nephew, Dimyan Snegirev, on April 30, 2013.  Id. at pp.26-27.

In May 2012, debtor represented in a credit application that he owned a number of pieces of farm equipment as well as a number of trucks and three cars.  Exh. 38 at pp.9-10.  These included the Ford F450 that he represented in his SOFA belonged to his father, the 1995 Dodge diesel, the 2006 Toyota Tacoma, the 1993 Infinity, and the Jetski that were disclosed on his bankruptcy schedules.  However, he also represented that

1    he owned a 2007 McCormick Tractor, a 2009 McCormick Tractor, five

2    rototillers, three mowers, a Morgan Tilt Bed Trailer, a 2007 Chevy

3    Duramax Flatbed, a 2005 Chevy Duramax Flatbed, a 1995 Freightliner Reefer

4    Truck, a 10 ft. Reefer Trailer, a 1997 Plymouth Voyager, a 2006 Ford

5    Escape Hybrid, and a John Deere Riding Mower.  Id.  None of those were

6    listed on his bankruptcy schedules.

7        Debtor testified that, other than the items that he listed as assets

8    on his bankruptcy schedules, the remainder of the equipment and vehicles

9    listed on the 2012 credit application did not belong to him but instead

10   belonged to various family members.  He overinflated his assets on the

11   credit application to assure that he would be able to get the credit that

12   he was seeking.  Debtor signed the credit application under an

13   acknowledgment that the application was true and correct.  Id. at p.11.

14       Despite debtor's denial that the equipment belongs to him, the UST

15   established that debtor insures the two Chevy Duramax Flatbeds, the Ford

16   F450, and the 1995 Freightliner Reefer Trailer.  Exh. 41, 43, 44, 45.

17   The Ford F450 is titled in his, not his father's, name.  Exh. 47.  Debtor

18   testified that he insures some vehicles for family members who have

19   difficulty obtaining affordable insurance in their own names because of

20   records of driving under the influence of intoxicants.  He also testified

21   that he sometimes purchases vehicles or equipment in his own name for his

22   father, because his father does not speak English very well.

23       In May 2013, debtor sold a Hyster 3000 forklift.  Exh. 23.  In April

24   2013 he sold the Toyota Tacoma to his nephew, Dimyan Snegirev.  Exh. 52.

25   In April 2014, he sold one of the McCormick tractors for $18,500.  Exh.

26   36.  The sale of the Toyota Tacoma was disclosed; the other sales were

Page 8 -   MEMORANDUM OPINION

not.

In early July 2013, farm workers who had obtained a May 2013 $163,716 judgment against debtor in federal district court for wage and hour violations issued a writ of garnishment to one of debtor's berry processors for collection of the judgment they had obtained against him. Exh. 13, 22.

Debtor filed bankruptcy on July 18, 2013. Debtor's schedules disclosed the following: that he had $72 in cash; that he had one bank account, which was at Wells Fargo; that he had no accounts receivable, because the receivables belonged to Snegirev but were issued in debtor's name; that he had monthly income of $2,400; that he had received approximately $7,800 in wages in 2013; and that he had transferred leases, crops, and the farming operation to Snegirev in May 2013. Exh. 3. Debtor's testimony at the § 341(a) meeting and the Rule 2004 exam was substantially consistent with the information contained in the bankruptcy documents.

Debtor has not filed a tax return since 2009. He testified at his Rule 2004 examination that he does not really maintain a lot of financial records for the business. Debtor deals largely in cash, and he does not have financial records to show or an explanation for where all of the cash went, other than to say that it went for business expenses.

DISCUSSION

The UST brings seven claims under four sections of § 727(a). The UST has the burden of producing evidence that supports each claim; once the UST produces that evidence, "the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a prima facie case." <u>In</u>

Page 9 -   MEMORANDUM OPINION

re Devers, 759 F.2d 751, 754 (9th Cir. 1985).  Accord In re Aubrey, 111
B.R. 268, 273 (9th Cir. BAP 1990).  The seven claims are in the
alternative.  Debtor's discharge will be denied if the UST prevails on
any one claim.

1.   Alleged transfer of the Berry Farm

A number of the claims or allegations within the claims involved
debtor's testimony that he transferred the Berry Farm to his sister in
2012,[7] which was more than a year before bankruptcy, and his assertion
that, because the business had been transferred and did not belong to
him, many of the assets and liabilities about which the UST complains, in
particular with regard to failure to disclose assets or liabilities, were
not his and therefore he did not have to report them.

The evidence shows that, in 2012, debtor decided to transfer the
Berry Farm to his sister, and he wrote her a note to that effect.  Exh.
12 at p.106.  He and Snegirev intended that debtor would continue to run
the business in 2013, using that berry season as a time to train Snegirev
in the business and transition the business to her.

The evidence also shows that neither debtor nor Snegirev ever did
anything to accomplish the transfer of the business.  Snegirev became
minimally involved in the business operations and she received a small
payment from the Berry Farm berry proceeds in 2013.  All transactions
with third parties continued as they had before, with debtor running the

---

[7]   Debtor testified that the date of the transfer listed on his
bankruptcy schedules of 2013 was a mistake, because he transferred the
Berry Farm to Snegirev in 2012.  I do not find the discrepancy in dates
significant, because I find that debtor did not in fact transfer the
Berry Farm.

1   Berry Farm, dealing with third party processors, and receiving berry

2   proceeds payments in his name.  Neither Snegirev nor debtor told their

3   uncle, the lessor of most of the Berry Farm property, that debtor was

4   transferring the business to Snegirev.  Neither Snegirev nor debtor told

5   the berry processors that Snegirev was the owner of the Berry Farm.

6   Snegirev never opened any bank accounts in her name for the business, nor

7   registered as owner of the Berry Farm with the Secretary of State.  To

8   third parties who dealt with debtor in relation to the Berry Farm,

9   nothing had changed.

10      Debtor's and Snegirev's testimony was that debtor intended to give

11  the Berry Farm to Snegirev.  Snegirev was not required to provide any

12  consideration for the transfer.  Therefore the question is whether debtor

13  made a gift of the Berry Farm to Snegirev.

14      Under Oregon law, a gift of personal property requires donative

15  intent, delivery of the property to the recipient with the intent that

16  the recipient have a present interest in the property, and acceptance by

17  the recipient.  Kesterson v. Cronan, 105 Or. App. 551, 554 (1991).

18      I find that debtor intended to transfer the Berry Farm to Snegirev,

19  and that he intended to use the 2013 berry season as a time to train

20  Snegirev in the business and to transition the Berry Farm from him to

21  her.  Donative intent, however, is not sufficient to complete a gift.  By

22  the time debtor filed his bankruptcy petition, he had not delivered the

23  Berry Farm to Snegirev with the intent that she have a present interest

24  in it.  Neither debtor nor Snegirev did anything to accomplish the

25  transfer.  The fact that Snegirev received nominal payments from Berry

26  Farm berry proceeds in 2013 and had started to learn the business are not

substantial enough, given the lack of any other indicia of a completed

transfer, to demonstrate that the Berry Farm had been delivered to her.

I conclude that when debtor filed his bankruptcy petition, the Berry Farm

had not been transferred to Snegirev and debtor continued to own it and

its profits.

Debtor maintained throughout this case that the Berry Farm was being

transferred, and that he did not view it as belonging to him.  He also

acknowledged, however, that he had done nothing to actually effectuate

the transfer legally, other than provide minimal payment to Snegirev and

begin to train her in the operation of the business.  Therefore, I

conclude that, despite debtor's intent to make a transfer, he knew that

he had not actually transferred the Berry Farm to Snegirev, and he knew

that the Berry Farm belonged to him on the petition date, not to

Snegirev.

I will now turn to the UST's claims.  The UST alleged seven claims,

all seeking denial of debtor's discharge.  If she prevails on any one

claim, debtor's discharge will be denied.  Given that the claims are

alternative bases for denial of discharge, and because I find that the

UST prevails on three of the claims, I will provide detailed findings and

conclusions on only those three claims and need not rule on the other

four claims.

2.  <u>False statements on bankruptcy documents (Claim #1)</u>

The UST's first claim alleges that discharge should be denied under

§ 727(a)(4)(A) because debtor knowingly and fraudulently made false

statements in his bankruptcy documents.

Section 727(a)(4)(A) provides that the debtor shall get a discharge

1  unless the debtor has knowingly and fraudulently made a false oath or
2  account in connection with the case.  The purpose of this provision "is
3  to insure that the trustee and creditors have accurate information
4  without having to conduct costly investigations."  In re Wills, 243 B.R.
5  58, 63 (9th Cir. BAP 1999).

6    To deny a debtor a discharge under this section, the plaintiff must
7  show that "(1) the debtor made a false oath in connection with the case;
8  (2) the oath related to a material fact; (3) the oath was made knowingly;
9  and (4) the oath was made fraudulently."  In re Roberts, 331 B.R. 876,
10 882 (9th Cir. BAP 2005), aff'd, 241 Fed.Appx. 420 (2007) (unpublished).
11 "A false statement or an omission in the debtor's bankruptcy schedules or
12 statement of financial affairs can constitute a false oath."  In re
13 Khalil, 379 B.R. 163, 172 (9th Cir. BAP 2007), aff'd, 578 F.3d 1167 (9th
14 Cir. 2009); In re Beaubouef, 966 F.2d 174 (5th Cir. 1992).

15   A false statement is material if it relates "to the debtor's
16 business transactions or estate, or concerns the discovery of assets,
17 business dealings, or the existence and disposition of the debtor's
18 property."  Wills, 243 B.R. at 62; In re Chalik, 748 F.2d 616, 618 (11th
19 Cir. 1984).  "'[A] discharge may be denied if the omission adversely
20 affects the trustee's or creditors' ability to discover other assets or
21 to fully investigate the debtor's pre-bankruptcy dealing and financial
22 condition.'"  Id. at 63 (quoting 6 Lawrence P. King et al., Collier on
23 Bankruptcy ¶ 727.04[1][b] (15th ed. Rev. 1998)).

24   "A debtor 'acts knowingly if he or she acts deliberately and
25 consciously.'"  Khalil, 379 B.R. at 173.

26   To show fraudulent intent, the plaintiff must show that debtor (1)

Page 13 - MEMORANDUM OPINION

made representations (2) when he knew they were false, and (3) he made them with the intent to and for the purpose of deceiving creditors.  In re Retz, 606 F.3d 1189, 1198-1199 (9th Cir. 2010).  Fraudulent intent may be inferred from the actions of the debtor, In re Devers, 759 F.2d 751, 753-54 (9th Cir. 1985), or from the surrounding circumstances.

> [M]ultiple omissions of material assets or information may well support an *inference of fraud* if the nature of the assets or transactions suggests that the debtor was aware of them at the time of preparing the schedules and that there was something about the assets or transactions which, because of their size or nature, a debtor might want to conceal.

Khalil, 379 B.R. at 175 (emphasis in original).

The UST alleges that debtor knowingly and fraudulently made a number of false statements in his bankruptcy schedules and Schedule of Financial Affairs ("SOFA").  Debtor does not deny that he made the representations or omissions, but argues either that the representations were true or that there is an explanation for the representations or omissions.

I agree that a number of the statements contained in debtor's bankruptcy schedules and SOFA were knowingly false, and that debtor knowingly omitted required information.

In his SOFA, debtor represented that in May 2013, he transferred leases, crops, and the farming operation of the Berry Farm to his sister, Snegirev.  Exh. 3 at p.26.  As I explained earlier in this opinion, debtor's representation that he had transferred the Berry Farm to Snegirev was false.  Although debtor intended to transfer the Berry Farm, he had not done anything to accomplish the transfer as of the petition date, and he knew it.  Therefore, I conclude that his statement that the Berry Farm had been transferred was knowingly false.

1   Debtor failed to disclose on Schedule B his ownership of the Berry
2   Farm.  Also on Schedule B, he valued the accounts receivable at $0, when
3   in fact he received tens of thousands of dollars in proceeds from the
4   2013 Berry Farm crop.  Because debtor knew that he had not actually
5   transferred the Berry Farm, these were also knowingly false statements.

6       Debtor also omitted his interest in the Berry Empire on Schedule B
7   and the SOFA, and failed to disclose on the SOFA the undisputed fact that
8   he had an interest in the Berry Farm within six years of the petition
9   date.  Exh. 3 at p.28.  He provided no explanation for these omissions.
10  Debtor knowingly omitted that information, which is a false statement.

11      Debtor failed to disclose on Schedule B the improvements he had made
12  to the Berry Farm, including posts and wires.  Debtor's only explanation
13  for the omission was that he had sold posts that had been given to him by
14  family members, and that such sale was not illegal.

15      Because debtor knew that he had not transferred the Berry Farm to
16  Snegirev, his failure to disclose the improvements to the Berry Farm
17  properties was a knowingly false statement.

18      The UST argues that debtor falsely listed his income in Schedule I
19  as $2,400 per month, and in his SOFA falsely showed income for the
20  prepetition period of 2013 as $7,800.  Although debtor and Snegirev had
21  agreed in spring of 2013 that debtor would receive a monthly salary of
22  $2,400 in 2013, in fact debtor received tens of thousands of dollars in
23  cash from the proceeds of the Berry Farm in 2013.

24      Debtor knew that he had not transferred the Berry Farm to Snegirev.
25  Although he had an understanding with her for a monthly salary, in the
26  absence of a transfer of the Berry Farm, the income he received came from

Page 15 - MEMORANDUM OPINION

1  the farm, not from the salary.  His statement that he had a monthly

2  income of $2,400 per month and had received $7,800 in 2013 was knowingly

3  false.

4      The UST also relies on debtor's omissions in his schedules of

5  creditors the IRS and Chernishoff, to whom debtor had subleased some of

6  the farm property.  Debtor neither listed the sublease to Chernishoff on

7  Schedule G, nor any debt owed to Chernishoff on Schedule F.  Debtor's

8  explanation was that the sublease with Chernishoff had been nullified by

9  Pirfil Cam's attempts to sell the leased property, and that he did not

10 list the IRS because he did not think that he owed any taxes at the time

11 he filed his schedules.

12     The evidence demonstrates that debtor entered into a sublease with

13 Chernishoff, Exh. 21, and that Chernishoff paid debtor a total of $20,000

14 in March 2013.  Despite debtor's argument that the sublease had been

15 nullified, there was no evidence that he had paid Chernishoff back for

16 the lease payment.  Thus, if debtor had been truthful on his schedules he

17 would have done one of two things.  Either he would have included a

18 prepetition debt to Chernishoff on Schedule F or he would have listed the

19 unexpired lease with Chernishoff on Schedule G.  He knowingly did

20 neither.  His omission of Chernishoff was a knowingly false statement.

21     The evidence also shows that debtor withheld taxes from employees'

22 wages in 2013, but there was no evidence that he had paid any of the

23 withheld taxes to the taxing authorities.  Thus, I infer that there are

24 employee taxes owing for 2013, making debtor's omission of the IRS false.

25 I also infer that debtor knew that there were employee taxes owing for

26 2013 that he failed to list on his schedules, based on the fact that he

had collected those taxes and not paid them over to the taxing authorities.  His failure to list the debt to the IRS was knowingly false.

The UST alleges other knowing, false statements in the bankruptcy documents.  Because the knowingly false statements listed above are sufficient to deny debtor's discharge under § 727(a)(4)(A), I need not address every single allegation.

The false statements were material; they related to debtor's business transactions and assets of the estate.

I conclude that the false statements were fraudulently made.  The sheer number of knowing, false statements and omissions supports a finding of fraud.  The assets and liabilities that were omitted were the type of business information that a debtor might want to conceal.

Fraudulent intent is also supported by evidence of other false statements and omissions, as well as by debtor's general lack of honesty in deceiving third parties in order to obtain financial benefits for himself or his family.

Debtor disclosed accounts at only one bank on his bankruptcy documents: Wells Fargo.  However, in fact he also had an account in his name at Columbia Bank, through which he ran tens of thousands of dollars of transactions.  He testified that he did not list the Columbia Bank account on the bankruptcy schedules because that account was used for Snegirev's business, and did not belong to him.  However, he did not disclose the account to Snegirev, he did not inform the bank that the account belonged to Snegirev and not to him, nor did he disclose on his schedules that he was holding funds in that account for a third party.

1  Debtor attempts to explain his omissions and misstatements as either
2  misunderstandings about the law or innocent errors.  However, it is clear
3  from his testimony that debtor was not truthful in his business and
4  bankruptcy dealings, but instead knowingly made whatever representations
5  -- true or not -- that were necessary to get what he wanted.  For
6  example, he listed numerous vehicles on an application for credit,
7  representing that they belonged to him, when he now says that many of
8  them actually belonged to family members.  He explained that the knowing
9  misrepresentation was intended to allow him to obtain credit.  Similarly,
10 he made representations in applications for vehicle insurance that he
11 owned the insured vehicles, when he now testifies that in fact he did not
12 own them.  These events demonstrate that debtor's approach to
13 truthfulness in his business dealings was extremely loose, and that
14 approach continued in his bankruptcy case.  The very purpose of those
15 misrepresentations was fraudulent: to induce reliance on them so that
16 debtor could get what he or his family members wanted or needed.
17 In our bankruptcy system, full and frank disclosure is absolutely
18 critical.  If debtor seeks the benefits of the bankruptcy system, he also
19 must abide by the obligations that the system demands.  The purpose of
20 § 727(a)(4)(A) is to make sure "that the trustee and creditors have
21 accurate information without having to conduct costly investigations."
22 In re Wills, 243 B.R. 58, 63 (9th Cir. BAP 1999).  Debtor's argument that
23 the trustee could have ascertained his business transactions and income
24 had he conducted sufficient investigation belies the purpose of the
25 disclosure requirements of the Bankruptcy Code.  It is the debtor's
26 obligation to provide full and truthful disclosure about his financial

1  condition, not the trustee's burden to conduct time-consuming and
2  burdensome investigation of that condition.

3      I conclude that debtor made knowing and false oaths or accounts in
4  connection with the case by both omitting assets and liabilities and
5  misrepresenting his financial condition.  Therefore, I will deny his
6  discharge under § 727(a)(4)(A) based on the UST's Claim #1.

7  3.   <u>Failure to keep adequate records (Claim #6)</u>

8      Under § 727(a)(3), a discharge will be denied if "the debtor has
9  concealed, destroyed, mutilated, falsified, or failed to keep or preserve
10 any recorded information, including books, documents, records, and
11 papers, from which the debtor's financial condition or business
12 transactions might be ascertained, unless such act or failure to act was
13 justified under all of the circumstances of the case[.]"  This provision
14 makes the debtor's "discharge dependent on the debtor's true presentation
15 of his financial affairs."  <u>In re Caneva</u>, 550 F.3d 755, 761 (9th Cir.
16 2008).

17     The debtor must present sufficient written evidence that will enable
18 creditors "reasonably to ascertain . . . [the debtor's] business
19 transactions for a reasonable period in the past."  <u>In re Cox</u>, 904 F.2d
20 1399, 1402 (9th Cir. 1990).  <u>Accord</u> <u>Caneva</u>, 550 F.3d at 761.

21     The plaintiff makes out a prima facie case by showing "(1) that the
22 debtor failed to maintain and preserve adequate records, and (2) that
23 such failure makes it impossible to ascertain the debtor's financial
24 condition and material business transactions."  <u>Meridian Bank v. Alten</u>,
25 958 F.2d 1226, 1232 (3d Cir. 1992) (quoted with approval in <u>Caneva</u>, 550
26 F.3d at 761).

Page 19 - MEMORANDUM OPINION

1    Once the plaintiff makes a showing that the debtor's records are

2  inadequate, the burden shifts to debtor "to justify the inadequacy or

3  nonexistence of the records." Caneva at 761 (quoting Cox, 41 F.3d at

4  1296); Meridian Bank, 958 F.2d at 1233. The debtor's justification will

5  be measured against what a reasonable person would do under similar

6  circumstances and will be evaluated in light of the education,

7  experience, and sophistication of the debtor, the nature and extent of

8  the debtor's business, and the amount of credit extended to the debtor.

9  Meridian Bank, 958 F.2d at 1231.

10    The UST alleges that debtor failed to keep or preserve information

11  from which his financial condition or business conditions might be

12  ascertained, and that his failure was not justified under the

13  circumstances of this case.

14    The evidence presented at trial established that debtor failed to

15  keep adequate records from which his financial condition and business

16  transactions could be ascertained. The only records debtor had were his

17  bank statements and some records showing wage payments to workers. The

18  UST showed that much of debtor's business was conducted in cash,

19  including making cash payments to his workers. The bank records show

20  that, although debtor deposited some of the berry proceeds checks into

21  his bank accounts, he also cashed many of those checks or took large cash

22  withdrawals from some deposits. He did not keep any records of what

23  happened to that cash, other than some records showing payments of

24  $50,032 to his workers. Of the $147,113 cash that the UST could show

25  went into debtor's hands, there was $97,081 in cash that was unaccounted

26  for during the six-month prepetition period in 2013.

Debtor ran a business that employed a number of seasonal workers and generated a significant amount of income. Yet he failed to maintain any type of record keeping system for the business. He dealt in large quantities of cash, and had no records to show what happened to much of that cash. The lack of business records makes it impossible to know whether his testimony that most of the income went to pay business expenses is true, or in any way to determine debtor's financial condition and business transactions.

Because the UST has shown that debtor failed to maintain adequate records, and that the failure makes it impossible to determine debtor's financial condition and business transactions, the burden shifts to debtor to justify the lack of records. Debtor did not provide any justification for his failure to keep adequate records. Although he testified that the money received in 2013 belonged to his sister, I have found that debtor knew that the Berry Farm had not been transferred to Snegirev prepetition. Debtor therefore knew that the income did not belong to her. Even if the business had been transferred to Snegirev, processors paid debtor for the berries, not Snegirev. Debtor did not keep any records of berry proceeds that he received, whether they belonged to him or to Snegirev. In addition, debtor did not maintain or provide any records of the business for 2012 or before, during a time when it is undisputed that debtor owned the business.

A reasonable person would maintain records of payments of business and personal expenses, including records to show the disposition of tens of thousands of dollars of cash. Debtor was not new to the berry business. His business generated substantial income. His lack of

Page 21 - MEMORANDUM OPINION

1  education does not justify his failure to keep any records to demonstrate

2  the disposition of the large amounts of cash that went through his hands.

3       Debtor failed to maintain business records to show what happened to

4  large quantities of cash.  He has not justified his failure to keep

5  adequate records.  Therefore, his discharge will be denied under

6  § 727(a)(3).

7  4.  Failure to explain loss or deficiency of assets (Claim #7)

8       The UST also alleges that debtor's discharge should be denied under

9  § 727(a)(5), which provides that discharge will be denied if the debtor

10 has failed to explain satisfactorily any loss of assets or deficiency of

11 assets to meet the debtor's liabilities.  The

12          objecting party bears the initial burden of proof and must
           demonstrate: (1) debtor at one time, not too remote from the
13         bankruptcy petition date, owned identifiable assets; (2) on the date
           the bankruptcy petition was filed or order of relief granted, the
14         debtor no longer owned the assets; and (3) the bankruptcy pleadings
           or statement of affairs do not reflect an adequate explanation for
15         the disposition of the assets.

16 In re Retz, 606 F.3d 1189, 1205 (9th Cir. 2010) (quoting In re Wright,

17 364 B.R. 51, 79 (Bank. D. Mont. 2007)).  In establishing that the debtor

18 failed satisfactorily to explain a loss of assets, the plaintiff need not

19 prove the debtor's intent to conceal.  In re Ridley, 115 B.R. 731, 735

20 (Bank. D. Mass. 1990).  Rather, once the plaintiff has established a loss

21 of assets, the debtor must explain the loss.  See In re Deers, 759 F.2d

22 751, 754 (9th Cir. 1985).  Vague and indefinite explanations of losses

23 that are based on estimates uncorroborated by documentation are generally

24 unsatisfactory.  In re Chalk, 748 F.2d 616, 619 (11th Cir. 1984).

25      The UST argues that, prepetition, debtor had access to substantial

26 amounts of cash, and that he has not been able to account for the

Page 22 - MEMORANDUM OPINION

disposition of those large amounts of cash.  In addition, debtor listed
in 2012 substantial farm equipment on a personal balance sheet, and he
has not explained what happened to that equipment.

As I explained above, in the six months before filing his petition,
debtor received $147,113 in cash.  He has been unable to account for
$97,081 of it.  When he filed his petition, he listed $72 in cash on his
schedules.  There was no evidence that he actually had more than the $72
in cash that he reported.  Therefore, the UST has shown that, in a period
not too remote from the bankruptcy filing, debtor had substantial
identifiable assets, and that, on the date of filing, he no longer had
those assets.[8]

Debtor has not been able to adequately explain what happened to that
large amount of cash.  His vague, uncorroborated explanation that the
cash was used to pay business expenses is not sufficient to explain the
disposition of the assets.  To the extent he claims that the cash
belonged to his sister and not to him, I have already found that debtor
had not actually transferred the Berry Farm to Snegirev prepetition, and
the income from that farm belonged to debtor, not to her.

Debtor's discharge will be denied under § 727(a)(5).

5.  Other claims (Claims #2, 3, 4, 5)

Because the court has determined that debtor's discharge should be
denied based on three independent grounds, i.e. debtor's failure to keep

_____

[8]    As for the farm equipment, debtor testified that it did not
belong to him.  Because the lack of explanation for what happened to the
large quantities of cash is sufficient to deny debtor a discharge under
this section, I need not determine whether in fact the items of equipment
were assets the loss of which debtor failed to explain satisfactorily.

Page 23 - MEMORANDUM OPINION

or preserve records from which his financial condition or business
transactions may be ascertained, his failure to explain the loss or
deficiency of assets to meet his liabilities, and his knowing, fraudulent
false oaths in his bankruptcy documents, I need not consider the
remainder of the UST's claims.

CONCLUSION

Debtor's discharge will be denied.  The UST should prepare the
judgment denying debtor his discharge.

###

cc:  Carla McClurg
     Prakopiy Cam